## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ANTHONY KARHOFF

     Plaintiff,                                   Case No.
                                                 Hon.

v.

HOME DEPOT U.S.A., INC., a foreign corporation,
DOUGLAS MAKIDON, in his corporate and individual capacities,
JASON BOIVIN, in his corporate and individual capacities,
BRENT RAMSEY, in his corporate and individual capacities,
MATTHEW GOODING, in his corporate and individual capacities, and
RON GOMES-PETRACH, in his corporate and individual capacities,

     Defendants.
_____

THOMAS R. WARNICKE (P47148)
Law Offices of Thomas R. Warnicke, PLLC
*Attorney for Plaintiff*
16291 W. 14 Mile Road, Suite 21
Beverly Hills, MI 48025
(248) 930-4411
tom@warnickelaw.com
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiff, Anthony D. Karhoff, by and through his attorneys, the Law

Offices of Thomas R. Warnicke, PLLC, for his Complaint against

Defendants, states and alleges the following:

1

## **JURISDICTION AND VENUE**

1.   This action is brought, in part, pursuant to the Family Medical Leave
     Act, (hereafter FMLA), 29 U.S.C. § 2601 *et seq*., and Michigan's
     Persons with Disabilities Civil Rights Act (PDCRA), MCL 37.1101 *et
     seq.*, under the entitlement or interference theory, as well as the
     discrimination or retaliation theory, and for other violations of state
     law.

2.   This Court has jurisdiction over this action pursuant to 42 U.S.C. §
     2000e-5, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.
     The court also has jurisdiction pursuant to 28 U.S.C. §§ 451,
     1331,1337,1343, and/or 1345.

3.   Declaratory, injunctive and other appropriate relief, including
     monetary, is sought pursuant to each of the aforementioned Acts.

4.   Plaintiff, Anthony D. Karhoff, currently resides in Bancroft,
     Michigan, and at all times relevant hereto, was a resident and citizen
     of the county of Shiawassee, state of Michigan and within the
     jurisdiction of this Court.

5.   Upon information and belief, Defendant, Home Depot U.S.A., Inc.
     (hereinafter referred to as "Defendant Home Depot" or "Home
     Depot") is a Delaware corporation, with its corporate headquarters in

Atlanta, Georgia. Defendant Home Depot does business throughout Michigan, the United States and internationally, including operating multiple retail stores within the jurisdiction of this Court.

6. Upon information and belief, Defendant Home Depot is the world's largest home improvement specialty retailer and owns/operates stores in all 50 states, the District of Columbia, Puerto Rico, U.S. Virgin Islands, 10 Canadian provinces and Mexico.

7. At all times relevant hereto, Plaintiff worked for Defendant Home Depot in District 244, including primarily at its retail store #2772 located within the jurisdiction of this Court, in the city of Owosso, county of Shiawassee, and state of Michigan. Plaintiff has also worked at other Home Depot stores within District 244.

8. Upon information and belief, Defendant Douglas Makidon, was at all times relevant hereto, employed as District Execution Manager (DEM) for Defendant Home Depot for District 244.

9. Upon information and belief, Defendant Makidon, was a citizen and resident of the State of Michigan, and/or otherwise within the jurisdiction of this Court, at all times relevant to the allegations pertaining to him contained herein.

10.    Upon information and belief, Defendant Makidon was transferred and/or took a new position with Home Depot on the East Coast in or about the summer of 2018.

11.    Upon information and belief, Defendant Jason Boivin, was at all times relevant hereto, employed as Assistant District Manager or Assistant District Execution Manager for Defendant Home Depot in District 244.

12.    Upon information and belief, Defendant Boivin, is a citizen and resident of the State of Michigan, and/or otherwise within the jurisdiction of this Court.

13.    Upon information and belief, Defendant Brent Ramsey, was at all times relevant hereto, employed as Department Supervisor at Home Depot store # 2772, and was Plaintiff's Supervisor.

14.    Upon information and belief, Defendant Ramsey was transferred to the Auburn Hills Home Depot store in or about winter of 2016.

15.    Upon information and belief, Defendant Ramsey, is a citizen and resident of the State of Michigan, and/or otherwise within the jurisdiction of this Court.

16.    After Defendant Ramsey left store #2772, Defendant Matthew Gooding became Plaintiff's Department Supervisor at store # 2772.

17. Upon information and belief, Defendant Gooding, is a citizen and resident of the State of Michigan, and/or otherwise within the jurisdiction of this Court.

18. Upon information and belief, Defendant Ron Gomes-Petrach was at all times relevant hereto, employed as District Execution Manager (DEM) for Defendant Home Depot in District 244.

19. Upon information and belief, Defendant Gomes-Petrach, is a citizen and resident of the State of Michigan, and/or otherwise within the jurisdiction of this Court.

20. Venue and jurisdiction is proper in this Court pursuant to Federal Question Jurisdiction (violation of the FMLA), as well as because Defendant Home Depot does business throughout the jurisdiction of this Court; the individual Defendant's were employed by Defendant Home Depot and worked within the jurisdiction of this Court, and the operative facts giving rise to the claims set forth herein took place within the jurisdiction of this Court.

21. Additionally, this Court has pendant jurisdiction over Plaintiff's state law claims.

22. Declaratory, injunctive and other appropriate relief, including monetary damages, is sought in an amount in excess of $75,000.

## GENERAL ALLEGATIONS AND STATEMENT OF CLAIMS

23.   Plaintiff repeats and re-alleges the allegations set forth above.

24.   Plaintiff is a 34-year-old male.

25.   On or about September 14, 2003, Plaintiff began his employment with Home Depot as a part-time Freight Team Associate.

26.   Plaintiff informed Home Depot, specifically Assistant Store #2772 Manager Joe Harper, during his interview for employment about his medical condition, underdeveloped sinuses, which caused chronic and severe migraines for years, along with the risk of stroke.

27.   Defendant Home Depot was aware of Plaintiff's medical condition at the time Plaintiff was hired.

28.   Plaintiff's medical condition is considered a disability under the Americans with Disability Act and the Michigan Persons with Disabilities Civil Rights Act.

29.   During his first few years, Plaintiff was allowed to take unlimited time off due to his medical condition/disability, with no reprimand from Home Depot.

30.   Despite his medical condition/disability, Plaintiff was a diligent and hard-working employee throughout his career at Home Depot.

31.   Plaintiff worked his scheduled shift from 4am to 8am, Monday through Friday.

32.   When Plaintiff was not at work, he volunteered his time to help the Shiawassee County Fair and worked with 4H and FFA members.

33.   In or around March 2004, the freight team that Plaintiff was part of at Home Depot, was rescheduled to work from 10:00 pm to 6:30 am Monday through Friday, resulting in Plaintiff being designated as a full-time employee.

34.   Plaintiff was not granted a raise after his first year due to his medical condition/disability and accommodations, despite his continued stellar work ethic and positive reviews.

35.   During 2004, Plaintiff attempted to advance his career at Home Depot and began volunteering for extra jobs around the store, including in inventory, garden recovery and the InFocus team.

36.   Additionally, Plaintiff became a paid-on-call volunteer firefighter with the Shiawassee Township Fire Department and participated in helping the Red Cross Annual Boot Drive Fundraisers.

37.   In 2005, Home Depot contacted Plaintiff about a position as the new InFocus team Captain.

38.    Plaintiff began working with management on safety and shrink issues, leading a team of five Home Depot associates, as well as setting up, planning and implementing a fire safety day to take place each September.

39.    Plaintiff applied for various supervisory positions with Home Depot, however, he was not even considered for any such positions.

40.    In 2006, Home Depot transitioned the full-time freight positions back to part-time positions and eliminated the third shift freight positions altogether.

41.    Home Depot did not have any full-time positions available for any of the associates, so Plaintiff and other third shift associates were forced to accept either part-time status or to quit their jobs.

42.    Plaintiff accepted a part-time position in Lumber and Building Materials, even though his working hours were not consistent.

43.    Plaintiff continued to maintain his position as InFocus Captain, leading his store to the highest safety scores within the district.

44.    Plaintiff continued to apply for other full-time sales associate and department supervisor positions but was never selected.

45.    In the meantime, Plaintiff continued his education by attending the Michigan Firefighter Training Councils Firefighter I + II Program,

completed his courses with top honors, and became a full certified firefighter serving the Township of Shiawassee.

46. Soon after, Plaintiff was hired as a reserve firefighter for the City of Owosso.

47. In 2007, Plaintiff sought additional employment to supplement his income, which had decreased as a result of his forced part-time status at Home Depot # 2772.

48. Additionally, Plaintiff enrolled in an EMT program to continue his education in emergency services.

49. Moreover, Plaintiff continued to seek other full-time sales and supervisory positions within Home Depot, however, he was never even afforded the opportunity of an interview for any such available positions.

50. Plaintiff was hired full-time at another company delivering currency Monday through Friday, and worked weekend shifts at Home Depot.

51. Plaintiff was selected as "Firefighter of the Year" for Shiawassee County and received a state proclamation to honor his overwhelming commitment to helping the public.

52. Plaintiff was also elected to serve as Trustee of the Shiawassee County Firefighters Association for a two-year term.

53.   In 2008, Plaintiff's home store (Home Depot # 2772) and District 320 (which later became District 244), asked him to join the Home Depot's MET program, to which Plaintiff agreed.

54.   Plaintiff and the MET Traveling team assisted with Home Depot's sets at three of its main stores (Fenton, East Lansing and Owosso) and if needed, other stores within District 320.

55.   Plaintiff wanted to explore more opportunities and decided to leave the Shiawassee Township Fire Department and was hired by the Vernon Township Fire Department as a firefighter.

56.   In 2009, Plaintiff was nominated by his peers as the Vernon Township Firefighter of the Year.

57.   Plaintiff finished his 2-year term at Shiawassee County Firefighters and was elected by all the firefighters/fire departments of Shiawassee County to serve as President of the Shiawassee County Firefighters Association for a 2-year term.

58.   In 2011, Plaintiff was advised by Home Depot to apply for and take intermittent FMLA leave due to the severity of his chronic pain/ disability.

59.   Plaintiff's condition/disability required him to seek numerous doctor visits and pain procedures continuously.

60.   Plaintiff, while under the advisement of his physician, was unable to operate any machinery or drive to work due to his condition and the medication he was taking, which required him to recuperate at home.

61.   Plaintiff returned to work when his pain management was at a level that was safe for driving and working.

62.   Plaintiff was promoted as Vernon Township Fire Department Sergeant, ending his term as President of the Shiawassee County Firefighters Association, and was elected to the Michigan State Fireman's Association as the 3rd Executive Director of the Board.

63.   Plaintiff was again selected as Firefighter of the Year, this time by the Argus Press Readers.

64.   In 2011, Plaintiff announced his intention to run for Shiawassee Township Supervisor.

65.   Home Depot began to redistrict its Michigan stores which resulted in Plaintiff's relocation to District 244.

66.   At this time, Plaintiff became part of a store centric team which eliminated his requirement of traveling to different stores.

67.   In 2012, Plaintiff, who was working as a MET Associate for Home Depot Store # 2772, also became the InFocus Captain, Coach for the

MET Team # 2772, and District Member on the MET employee committee.

68. In or about 2012, Plaintiff was elected as the 2nd Executive Director of The Michigan State Firemen's Association.

69. Additionally, in 2012, Plaintiff was elected by the residents of Shiawassee Township to serve a 4-year term as Shiawassee Township Supervisor.

70. In 2013, Plaintiff applied for instore management positions at Home Depot.

71. Yet again, Plaintiff was not considered nor interviewed for any of the open positions at Home Depot for which he had applied.

72. Furthermore, even Plaintiff's applications for various training opportunities were denied.

73. In 2014, Plaintiff continued to work with his various paid and voluntary positions with increasing responsibilities.

74. In 2015, while Plaintiff continued his regular position with Home Depot, as a MET Associate for Store # 2772, and the InFocus Captain for the MET Team # 2772, Plaintiff was targeted for the use of his FMLA.

75. Specifically, Plaintiff's Supervisor stated that he needed someone continuously present to represent team members, unlike Plaintiff who sometimes was off work on FMLA leave.

76. Though Plaintiff repeatedly informed his Supervisors that heavy or repetitive lifting aggravated his medical condition/disability, Plaintiff was assigned very onerous and difficult tasks because of his strength and size, which were not given to other associates.

77. During 2015, Plaintiff again applied for open instore management positions at Home Depot, however, he was not considered nor interviewed.

78. Furthermore, Plaintiff's additional training requests at Home Depot were ignored and/or denied again.

79. At or around this time, Plaintiff became the youngest elected Chairman and President of the Michigan Townships Association Shiawassee County Chapter.

80. Plaintiff was selected as Best Elected Official/Politician of the Year by the Argus Press Readers.

81. In 2016, Plaintiff sought and won the Democratic Party nomination through a primary election for the 85th District House of Representatives.

82.   Despite Plaintiff's need for intermittent FMLA leaves, Plaintiff's direct and District Managers at Home Depot had no choice but to give him continuously good work reviews due to Plaintiff's stellar performance.

83.   Plaintiff continued to request higher level positions and promotions with Home Depot, but despite his good reviews, Plaintiff's managers would not designate him as promotable.

84.   Plaintiff's managers would also refuse or fail to note on his reviews that their decision was based on his use of FMLA, however, they would verbally state that their failure to do so was directly because of his attendance that was associated with his FMLA leaves.

85.   Plaintiff's managers continued to manipulate other areas of his performance reviews in a negative manner in order to keep him in his position and designation as "not promotable," even though Plaintiff had years of experience and was more than qualified that other similarly situated employees.

86.   On more than one occasion, Plaintiff's confidential information was leaked to other associates stating that his absences were protected under FMLA.

87.    Such confidential information was leaked by Defendants Ramsey and
       Gooding.

88.    These violations of Plaintiff's privacy and related HIPAA laws, forced
       Plaintiff to find himself in unfortunate positions of having to explain
       his situation to stop the rumors from co-workers.

89.    Plaintiff always called in for FMLA leave by calling the
       Merchandising Execution Manager, Defendant Boivin, for the
       Merchandising Execution Team as he had been directed to do.

90.    As Plaintiff's procedures and pain increased, he started to use more
       and more FMLA time, gradually depleting and regaining FMLA hours
       based on a rolling calendar year.

91.    On or about December 8, 2016, Plaintiff received an email noting the
       number of available FMLA hours for use and when more hours would
       become available.

92.    Plaintiff properly noted all dates and kept all records.

93.    Such related records included an email on or about September 21,
       2016, which Plaintiff had received from Defendant Boivin, which
       indicated his Plaintiff's number of available FMLA hours as of
       December 29, 2016.

94.   Specifically, the email indicated that Plaintiff had 32.75 available FMLA hours as follows: 12/29/2016 (8 hours), 1/5/2017 (2.75 hours), 1/12/2017 (8 hours), 1/14/2017 (6 hours), and 1/25/2017 (8 hours).

95.   On or about January 3, 2017, Plaintiff called in to use 8 hours of his FMLA leave.

96.   On or about January 13, 2017, Plaintiff called in to use 8 hours of his FMLA leave.

97.   On or about January 18, 2017, Plaintiff called in to use 8 hours of his FMLA leave.

98.   On or about February 2, 2017, Plaintiff called in to use 8 hours of his FMLA leave.

99.   On or about February 3, 2017, Plaintiff was called to the back room at Home Depot where he was confronted by his Managers, Defendants Boivin and Makidon.

100.  Plaintiff was informed that he was being terminated because he called in on January 8 but did not have any available FMLA leave time.

101.  Plaintiff immediately informed his Managers that he had previously received an email, from Defendant Boivin, with his available FMLA time listed.

102.   Defendants Boivin and Makidon both stated to the effect: "We don't care.  We had an audit done and it said you don't have any time available."

103.   Plaintiff was informed that because he did not have any FMLA or personal time, his termination was a direct result of a violation of Home Depot's time and attendance policy.

104.   After Plaintiff was informed of his termination, Defendant Gooding walked him out of the building in front of various co-workers of Plaintiff.

105.   This was extremely embarrassing and humiliating to Plaintiff.

106.   Thereafter, Plaintiff promptly continued to inform his supervisors and Home Depot's HR department that he had enough FLMA time to cover his leaves and that an error must have occurred.

107.   Yet, Home Depot refused to acknowledge that an error had occurred.

108.   Home Depot upheld Plaintiff's termination.

109.   Home Depot cut off Plaintiff's health benefits.

110.   Plaintiff had to discontinue his pain treatments because his Home Depot health benefits were terminated.

111.  Soon after, whenever Plaintiff was out in his small community, people frequently approached him and inquired about why he no longer worked at Home Depot.

112.  Such inquiries left Plaintiff embarrassed, humiliated, and desolate.

113.  Plaintiff was also very anxious and concerned about his political career, especially with all of the negative and false rumors about Plaintiff going around the community about his sudden and unexpected termination from Home Depot.

114.  On February 20, 2017, Plaintiff was instructed by someone at Home Depot HR and/or Advice and Counsel Group to contact his "DEM" (who was Defendant Makidon) about his FMLA determination and termination from employment.

115.  Plaintiff placed several calls to Defendant Makidon as instructed and left messages.

116.  However, none of Plaintiff's calls or message to Makidon were answered.

117.  On February 23, 2017, Plaintiff's attorney contacted Home Depot's counsel requesting Plaintiff's employment and medical file and sent a letter in an attempt to obtain more information regarding Plaintiff's

wrongful termination and to determine if a resolution could be reached.

118. Several hours later, Defendant Makidon contacted Plaintiff to inform him that there were, in fact, errors on his FMLA time calculations, that Home Depot made a mistake and that he wanted Plaintiff to return to work at Home Depot.

119. Plaintiff needed to give 2 weeks' notice to his employer at that time, a position that he had been forced to accept with less salary and benefits than he had been receiving at Home Depot.

120. Additionally, Plaintiff denied Plaintiff's request for unemployment during the time he was terminated.

121. On or about March 11, 2017, Plaintiff spoke to Dan Wenzlick, a Merchandising Execution Associate at store # 2772, who stated that Defendant Makidon met with the Merchandising Execution Team and told them to treat Plaintiff as if nothing ever happened, like he had been on "an extended leave."

122. Plaintiff was informed that he would receive a check for 120 hours, excluding the two weeks that he needed to notify his other employer about his rehire to Home Depot.

123. However, Plaintiff was told by Home Depot, via Defendant Makidon, that he would still be on Final Warning.

124. Defendant Makidon told Plaintiff in very threatening and hostile manner that if Plaintiff was ever late or called in again for work, he would be terminated.

125. Plaintiff felt threatened and retaliated against by Defendant Makidon's stateements and wondered if he was being set up to fail.

126. Plaintiff requested the balance of his FMLA time and was told that HR would have the figures along with his direct deposit and benefits reinstatement.

127. Plaintiff feared being late one day and was told by other co-workers that they were only verbally reprimanded when they showed up over two hours late to their shift.

128. Home Depot's HR told Plaintiff that all records regarding his termination were unavailable for review.

129. Plaintiff found HR's statement very suspicious and strange.

130. Home Depot's Benefit Line, however, indicated that Plaintiff was still terminated, and that his benefits were not available.

131. The Benefit Line also did not have any information about the FMLA time available for Plaintiff.

132. On or about March 14, 2017, the store opener for Home Depot #2772 was late, causing Plaintiff to be late for punching in (even though Plaintiff was not late), requiring his manager, Defendant Gooding, to record all of Plaintiff's time manually so ensure that Plaintiff would not be terminated.

133. Plaintiff again called Home Depot HR to determine the amount of FMLA available and was told to call back on March 21, 2017.

134. On March 13, 2017, Plaintiff had to explain to his co-workers that he was not terminated, only to have his co-workers respond with anger and non-cooperation while working with Plaintiff.

135. Co-workers were told by management not to talk to anyone about the situation including Plaintiff.

136. Plaintiff was, however, informed by a co-worker that all of the associates were angry at him and to expect a hard time from them when he returned.

137. Plaintiff asked his co-worker exactly who was mad at him and why, to which the co-worker responded, "no comment on that, you might want to sue me."

138. Plaintiff was informed by another co-worker that some co-workers were saying that Plaintiff "cried wolf" and were upset that he was back because they wanted his position, specifically Sarah Mertle.

139. Plaintiff continued thereafter to be harassed by Sarah Mertle, who swore at Plaintiff, including such comments as "F**k I hate this", "I f**king hate working here."

140. Plaintiff only received payment for the 115.5 hours, the additional 88 hours are currently unpaid.

141. The Home Depot system continued to designate and report that Plaintiff was not eligible for FMLA leave, including intermittent leave, needlessly causing Plaintiff a great deal of worry and feelings of desperation about what to do when he was overcome with pain.

142. On or about April 26, 2017, Plaintiff went to see his specialist and she expressed her concern over the fact that Plaintiff had experienced an interruption in the sequence of his medical procedures, which left him in more pain and informed him that he would have to have additional procedures to correct the issue as much as possible.

143. On or about May 1, 2017, Plaintiff was told unofficially that he would not be interviewed for an open Supervisor's position on the 3rd shift freight team specifically because he was on intermittent FMLA.

144.   Plaintiff once again applied for a position of MET.

145.   Plaintiff was not interviewed by management, despite management informing employees that everyone who applied would be interviewed.

146.   This was also in further retaliation of Plaintiff's FMLA status and complaints made by his attorney to Home Depot corporate.

147.   On or about June 9, 2017, Plaintiff's supervisor, Defendant Gooding informed his whole team that Plaintiff was taking off a half day for a medical procedure.

148.   Such information should not have been conveyed by Gooding to other employees at the store.

149.   Divulging such private medical information of Plaintiff was retaliatory and in violation of HIPAA laws.

150.   Defendant Gooding disclosed such information for the purpose of inciting the wrath of his co-workers against Plaintiff for taking FMLA time off.

151.   On or about July 12, 2017, Plaintiff immediately called in to work after he discovered his mother, who is disabled, had fallen and sustained multiple injuries.

152. Upon his return the next day, Plaintiff apologized to his associates for the necessary call in, only to receive ridicule and comments such as "that's what life alert is for."

153. Defendant Home Depot's managers were aware of the harassment toward Plaintiff and did nothing to stop it.

154. In fact, their actions promoted and encouraged such harassment and retaliation.

155. Plaintiff was further harassed and retaliated against by Pam Patsey, Dan Wenzlick, Defendant Gooding, Sarah Mertle, and Defendant Boivins, all of whom teamed together and conspired to make it a hostile environment for Plaintiff due to his FMLA leave/disability status.

156. Plaintiff was also subjected to mocking comments about his physical status and age such as "you're falling apart," "you're a mess," and "we should take you out back and shoot you," which were again attributed to Plaintiff's FMLA/disability status.

157. Plaintiff consistently applied for other and better positions and promotions at Home Depot to further his career, including at store # 2772 and others within the same district 244.

158.   However, Plaintiff was refused and/or denied any promotional opportunities he was qualified and applied for.

159.   Plaintiff even received an admission from Home Depot Assistant Manager, Byrne (last name unknown), that Plaintiff was being blackballed and that he was not going to be offered any promotional positions because she had talked to Plaintiff's managers and was told that Plaintiff took too much time off with his FMLA leaves and had "things in the closet" about his attendance.

160.   Plaintiff was also embarrassed to be forced to inform his managers about his sexuality since his "partner" had applied to work at the same store.

161.   On or about November 20, 2017, Plaintiff, once again, applied for a supervisory position within his own district team.

162.   Furthermore, the company policy states that all who apply for a position are required to receive an interview.

163.   Yet, the interviewer for the position, Defendant Boivin, never interviewed Plaintiff.

164.   This was in direct violation of Home Depot policy.

165. Boivins' failure and refusal to interview Plaintiff was also directly in retaliation for Plaintiff's FMLA leave status and for his complaints to Home Depot management, including through Plaintiff's attorney.

166. On November 23, 2017, Plaintiff called Associate Advice Counsel Group to report a workplace harassment in which he was being targeting by Associate Sarah Mertle.

167. On November 28, 2017, Plaintiff greeted Ms. Mertle in which he was left with Ms. Mertle stating that "she f***ing hates this place" and continued to question Plaintiff on if he was purposely wearing cologne to make her sick.

168. Plaintiff responded to the accusation by stating that he wasn't wearing cologne and that he didn't do anything different than any other day.

169. Furthermore, Plaintiff reported issues such as this in the past to his supervisor Defendant Gooding, to which Defendant Gooding approached Ms. Mertle advising her to seek medical attention to get allergy testing that she could give to the company.

170. Upon information and belief, Ms. Mertle has still not sought medical attention, nor has she submitted any documentation stating that she has any allergies.

171. In opposition of Ms. Mertle's friendly attitude towards to all other Home Depot employees, Ms. Mertle always communicates to Plaintiff negatively.

172. Additionally, Plaintiff has attempted to give Ms. Mertle advice on how to become a better associate and tips on how to reach full-time employment, but always received negativity from her in return.

173. On December 18, 2017 Plaintiff was working in bay 29-003 on the floor when he asked Ms. Mertle, who was working in bay 29-005, if she could put a rubber plug in her bay in which he got no response from Ms. Mertle.

174. Plaintiff then asked Ms. Mertle, again, if she could put the rubber plug in her bay because he was on the floor.

175. In response, Ms. Mertle looked at Plaintiff and said, "well then put it away."

176. Plaintiff again asked Ms. Mertle and after many refusals, Plaintiff began to get up to put the item away.

177. As Plaintiff attempted to get up, he began to feel a burning sensation in his knee.

178.   After the incident, Plaintiff reported both the issue with Ms. Mertle and the injury to Defendant Gooding, but no report was taken until 2 days later, on December 20, 2017.

179.   Within this report, Plaintiff stated to Defendant Gooding that teamwork was a must to be successful to get their jobs done correctly.

180.   Plaintiff continued to say that the actions of Ms. Mertle caused an injury because she was upset about Plaintiff coming back from wrongful termination and not allowing her to fill his position.

181.   Defendants allowed Ms. Mertle's harassing and retaliatory actions to be perpetrated against Plaintiff without taking any remedial action.

182.   Plaintiff sought medical attention for his injury, and the Emergency Room doctor requested that he take 5 additional days off to rest his knee.

183.   Plaintiff submitted the previous information to Defendant Gooding.

184.   On June 1, 2018, Plaintiff used 4 FMLA hours, which left him with 8.25 remaining hours until the following week, in which more hours would reload.

185.   On June 3, 2018, Plaintiff used 3 FMLA hours.

186.  On June 4, 2018, Plaintiff had to have an unexpected procedure done which left him in pain, unable to drive, bend, or stand for long periods of time.

187.  Subsequently, Plaintiff had to call in without FMLA because he didn't have enough time to cover the shift.

188.  On June 4, 2018 Plaintiff sent a text message to Defendant Boivin informing him of the unexpected procedure and inquired about the number of occurrences that he had.

189.  Defendant Boivin later replied that Plaintiff had a total of 8 occurrences from December 22, 2017 through June 4, 2018.

190.  Yet, Plaintiff's records indicate that he had 2 occurrences, a weather call-in which he was told was excused, and a call in for illness.

191.  Plaintiff grew worrisome considering the company policy stated that after the first 3 occurrences the employee would receive coaching, at 6 occurrences the employee would receive counseling, at 8 or 9 occurrences the employee would receive a final warning, and any more after that would result in termination.

192.  On or about June 7, 2018, Plaintiff reviewed his attendance with his supervisor, Defendant Gooding, and they found many inaccuracies

and dates that had been marked FMLA, were promised excused absences, or not properly reviewed as adjusted schedule.

193.   Furthermore, the review of Plaintiff's attendance resulted in his discovery that he only had 2 occurrences with one pending due to weather on January 29, 2018.

194.   In the summer of 2018, Plaintiff received a six-month review.

195.   On or about August 14, 2018, Defendant Gooding informed Plaintiff that he was responsible for a generic review but Defendant Boivin, who previously tried to terminate Plaintiff, would be writing Plaintiff's yearly review.

196.   Originally, Plaintiff spoke with Defendant Gooding about using 4 weeks of Vacation Time (for an upcoming procedure to alleviate his back pain) so that he would still be compensated while off work.

197.   This had been done numerous times in the past with no issues.

198.   Defendant Gooding informed Plaintiff that it would not be a problem and to not worry about it.

199.   However, Plaintiff was informed that his Vacation Time had been denied by Defendant Boivin 2 weeks prior to the procedure.

200. Plaintiff went to Home Depot HR to address the matter and Plaintiff was informed by HR that it was the Manager's (Defendant Boivin's) discretion to approve or deny the request.

201. Based on the Plaintiff's past experiences with Defendant Boivin, he knew that any discretion would not be used in his favor due to his retaliatory animus against Plaintiff's FMLA status and disability, and in retaliation for Plaintiff's complaining about same.

202. Subsequently, Defendant Boivin informed Defendant Gooding that Plaintiff would have to go on a Leave of Absence (LOA) for the upcoming procedure.

203. Soon after, Plaintiff had to meet with District Manager Defendant Gomes, who reassured Plaintiff that his medical would be paid while on the LOA and Plaintiff would still be compensated.

204. Plaintiff completed all necessary paperwork for his LOA and was approved.

205. However, Plaintiff was denied for his FMLA recertification.

206. Defendant Gomes reassured Plaintiff that he did not need to worry about recertifying for his FMLA Intermittent Leave until after Plaintiff came back from his LOA.

207.   On or about August 17, 2018, Plaintiff underwent his anticipated procedure to alleviate his back pain.

208.   In order to limit exposure to germs and infections, Plaintiff had to refrain from showering for a minimum of 24 hours following the back procedure.

209.   Plaintiff's pain progressively worsened and due to its severity, he took pain medications as prescribed.

210.   On or about August 18, 2018, Plaintiff informed MEM Defendant Boivin and Defendant Matt Gooding that he would not be able to work as a result of the side effects from the pain medication as well as his fear that he would be in violation of company policy regarding hygiene.

211.   Plaintiff also stated that he did not have any available FMLA time to use, therefore, it would be documented as an occurrence if the medical situation was not excused.

212.   On or about November 15, 2018, Plaintiff informed Human Resources that he needed intermittent leave due to his serious health condition.

213.   On or about November 23, 2018, Human Resources informed Plaintiff that he was not eligible for FMLA leave because he had not met the FMLA's 1,250 hours work requirement.

214.  Plaintiff was informed that he was 53 hours shy of the FMLA's 1,250 hour requirement.

215.  Plaintiff addressed his issues with HR's determination/calculation.

216.  Plaintiff had lost hours due to a workers' compensation incident and his LOA leave for surgery, which should have been applied toward his FMLA 1,250 hour requirement.

217.  If Plaintiff's aforementioned hours were appropriately applied, Plaintiff would have qualified for intermittent leave of absence FMLA.

218.  Plaintiff submitted his FMLA paperwork at least two times.

219.  While Plaintiff's first submission of FMLA paperwork was denied, his second submission was approved.

220.  On or around the beginning of December 2018, Plaintiff formally requested reasonable accommodations (until his FMLA review was complete) from his department head/supervisor and district manager.

221.  However, Plaintiff was informed that he would not be accommodated for his attendance due to his medical condition.

222.  Plaintiff was also informed that he had a pending write-up on his file due to the denied FMLA and he could either be put on a final warning or terminated due to his attendance related to his medical conditions.

223. On or around January 3, 2019, Plaintiff was informed that he was eligible for FMLA leave for his intermittent leave which began on November 30, 2018.

224. Additionally, Plaintiff was informed that as of January 2, 2019, he had 114.25 available FMLA hours to use.

225. On January 14, 2019, Plaintiff was told by Home Depot HR that Plaintiff needed to be put on a medical LOA and that Plaintiff would be sent such paperwork to fill out.

226. Thereafter, Plaintiff fully complied with all requests for any information and paperwork.

227. However, Defendant Home Depot harassed and retaliated against Plaintiff by objecting to the medical paperwork Plaintiff's doctor provided.

228. Defendant Home Depot and Gomes, including Defendant Gomes refused to adhere to Plaintiff's properly submitted paperwork and LOA verification.

229. In fact, Defendant Home Depot and Gomes informed Plaintiff that they could not provide reasonable accommodations of temporary limited bending and stooping.

230.   Defendant Home Depot and Gomes told Plaintiff that the only position he could work at was at store #2716 as a door greeter.

231.   The door greeter position would have been at half Plaintiff's existing pay rate, caused additional travel times and costs, and would not have allowed Plaintiff to receive medical benefits.

232.   Most significantly, Plaintiff would have been removed from any FMLA protections.

233.   Defendant Home Depot and Gomes failed to provide Plaintiff's reasonable accommodations in retaliation for Plaintiff's FMLA/ disability status.

234.   Plaintiff was further harassed and discriminated against by Defendant Home Depot and Gomes by their decision to not pay Plaintiff for actual hours worked by Plaintiff.

**COUNT 1**
**VIOLATION OF THE FMLA - 29 U.S.C. § 2601 *et seq*.**
**(Entitlement, Interference, Discrimination and Retaliation Claims)**

235.   Plaintiff repeats and re-alleges the allegations set forth above.

236.   Plaintiff was an eligible employee within the meaning of the Family and Medical Leave Act (hereinafter "FMLA") as of the date(s) he requested time off.

237.  Plaintiff was employed by Defendant Home Depot for a time period greater than 12 months as of the date(s) he requested FMLA time as stated above.

238.  During the aforementioned 12 months, Plaintiff worked greater than 1,250 hours.

239.  Defendants were at all relevant times an "employer" within the meaning of the FMLA.

240.  Defendants, as explained above, interfered with, restrained and denied Plaintiff's exercise and attempted exercise of his rights under the FMLA by retaliating against him for taking his approved leave or not allowing Plaintiff to take appropriate leave under the Act.

241.  Defendants' unlawful actions were made in an intentional and deliberate disregard for Plaintiff's rights.

242.  As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; anxiety, indignation, depression, sleeplessness, weight fluctuation, loss of the ordinary pleasures of everyday life, inability to socialize and enjoy his community, including the right to a gainful occupation

of choice.  Plaintiff is also entitled to additional compensatory and punitive damages.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, as follows:

a.  Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

b.  Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

c.  Judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled;

d.  An award for the value of lost fringe and pension benefits, past and future;

e.  Liquidated damages equal to the amount of wages, salary, employment benefits, or other compensation denied or lost by reason of Defendants' violation of 29 USC 2617, plus interest;

f.  An award of common law or statutory interest, costs, and attorney fees;

g.      An injunction prohibiting any further acts of retaliation or discrimination; and

h.      Whatever other equitable relief appears appropriate at the time of final judgment, including reinstatement, promotion or employment.

i.

## COUNT 2

## VIOLATION OF MICHIGAN'S
## PERSONS WITH DISABILITIES CIVIL RIGHTS ACT
### MCL 37.1101 *et seq.*
### (Discrimination and Retaliation)

243.   Plaintiff repeats and reincorporates set forth above.

244.   At all times pertinent hereto, Defendants had at least 15 employees and was Plaintiff's employer within the meaning of the Michigan Persons with Disabilities Civil Rights Act (PDCRA).

245.   The individual named Defendants were also Plaintiff's "employer" within the meaning of the PDCRA.

246.   Plaintiff was a disabled person within the meaning of the PDCRA.

247.   Plaintiff was discriminated against by Defendants because of his disability and/or his perceived disability.

248. At all times relevant hereto, Plaintiff was qualified for his position with Defendants.

249. Moreover, Plaintiff was able to perform the essential functions of his job, with or without reasonable accommodations.

250. Such reasonable accommodations included, but were not limited to, allowing Plaintiff to take mental health absences to better care for himself.

251. Providing such reasonable accommodations would not have resulted in any hardship to Defendants.

252. Plaintiff suffered an adverse reaction when he was retaliated against due to his disability.

253. Defendants knew or had reason to know of Plaintiff's disability.

254. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to a gainful occupation of choice. Plaintiff is also entitled to additional compensatory and punitive damages.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, as follows:

a.    Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

b.    Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

c.    Judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled;

d.    An award for the value of lost fringe and pension benefits, past and future;

e.    An award of interest, costs, and reasonable attorney fees;

f.    An injunction prohibiting any further acts of retaliation or discrimination; and

g.    Whatever other equitable relief appears appropriate at the time of final judgment, including but not limited to reinstatement.

## COUNT 3

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

255. Plaintiff repeats and reincorporates by reference the above stated paragraphs.

256. As set forth above, Plaintiff was subjected to extreme and outrageous conduct by Defendants; Defendants' conduct was intentional and reckless; and Defendants' conduct caused Plaintiff severe emotional distress.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants as follows:

  a. Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

  b. Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

  c. Judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled;

  d. An award for the value of lost fringe and pension benefits, past and future;

e.     An award of interest, costs, and reasonable attorney fees;

f.     An injunction prohibiting any further acts of retaliation or discrimination; and

g.     Whatever other equitable relief appears appropriate at the time of final judgment.

## COUNT 4

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

257.   Plaintiff repeats and reincorporates by reference the above stated paragraphs.

258.   As set forth above, Plaintiff was subjected to extreme and outrageous conduct by Defendants.

259.   Defendants' conduct was negligent and Defendants' conduct caused Plaintiff severe emotional distress.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants as follows:

a.     Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

b.      Exemplary and/or punitive damages in whatever amount

Plaintiff is found to be entitled;

c.      Judgment for lost wages, past and future, in whatever amount

Plaintiff is found to be entitled;

d.      An award for the value of lost fringe and pension benefits, past

and future;

e.      An award of interest, costs, and reasonable attorney fees;

f.      An injunction prohibiting any further acts of retaliation or

discrimination; and

g.      Whatever other equitable relief appears appropriate at the time

of final judgment.

Respectfully submitted,

 /s/ *Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Law Offices of Thomas R. Warnicke, PLLC
*Attorneys for Plaintiff*
16291 W. 14 Mile Road, Suite 21
Beverly Hills, MI 48025
(248) 930-4411
tom@warnickelaw.com

## __JURY DEMAND__

Plaintiff hereby demands a jury trial in this action.

Respectfully submitted,

/s/ *Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Law Offices of Thomas R. Warnicke, PLLC
*Attorneys for Plaintiff*
16291 W. 14 Mile Road, Suite 21
Beverly Hills, MI 48025
(248) 930-4411
tom@warnickelaw.com